UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

RECEIVED

SEP 22 2017

CLERK, U.S. DISTRICT COURT
ST. PAUL, MINNESOTA

--------------------------------------------------------------------------

Vara Birapaka,

Case No. 17–cv–04090–PAM/KMM

Plaintiff,  **AMENDED COMPLAINT**

vs.

U.S. Army Research Laboratory, The Regents of the University of California,
The Regents of the University of California and Griffith University, University of PA,
Wayne State University, Purdue University, The Trustees of Indiana University ,
University of Central Florida (which has the contract to develop RF sensors for
Military), East Central University, Oregon State University, Consortium for Public
Education, Greater Muskegon Catholic Schools, Mona Shores Public Schools,
BD of Trust/Comm. Col. District 535, Rutgers University, University of Texas,
Dartmouth College (Neural Dust research), Dept of Material Science and
Engineering, Rutgers University/NASA, University of Utah, University of Texas,
Wright–Patterson A.F Base, Max Plank Institute, Germany, McGill University/US
Army, The University of Texas Health Science Center, San Antonio, University of
Illinois, Chicago, University of California–Berkeley, University of Texas–Arlington,
University of Texas–Austin, Bilkeni University Turkey, Qualcomm, Inc., University
of Melbourne,  University of California–San Diego, US Navy Research Laboratory,
University of Southern California, Guangzhou Zheng, LEO Pharma, Inc., Malcolm
Fraser, University of Notre Dame, Randy Lewis, University of Wyoming, Kim
Thompson, Kraig Biocraft Laboratories, Inc., Lincoln Laboratory, Massachusetts
Institute of Technology, D–Wave Corporation, International Business Machine, Inc.,
Lockheed Martin, General Dynamics, Alphabet, Raytheon, Dept. of Justice Legal
Counsel, Dept. of Defense General Counsel, Director, DIA ASD(P), Minnesota Dept.
of Human Services, Central Intelligence Agency, Federal Bureau of Investigations,
National Security Administration, Mark Dayton – Governor of Minnesota,
Minnesota Attorney General – Lori Swanson, City of Eagan, City of Bloomington,
David Wade, Vicki S. Thompson, Seungdo Kim

SCANNED

SEP 2 2 2017

U.S. DISTRICT COURT ST. PAUL

Defendants.

---------------------------------------------------------------------------

To the Court and Defendants:  This case is about human subject research and experimentation, intelligence warfare, trafficking, torture, violation of civil and human rights, industrial espionage, RICO Violations, oppression and enslavement by technological and other means thrust upon on the people who, like the Plaintiff, are placed on target lists by the individuals, groups, both inside or outside the United States government. They have authorized funds and permitted experimentation and testing of potential wartime technologies by those who work for agencies, corporations, groups and individuals.

# CONTENTS

1. Complaint

2. Subject Matter Jurisdiction and Venue

3. Federal Statutes and Additional Violations Included in this Complaint

4. No Statute of Limitations

5. Introduction and Statement of Claim

6. Targeting of Plaintiff

7. Human Subject Research

8. Human Experimentation of Plaintiff

9. Plaintiff Property Sabotaged, Vandalized and Attacked

10. Intellectual Property Theft

11. Extraordinary Circumstances call for discretion by the court

12. Dr. Scott Benson Report

13. Dr.Susan Kolb's Affidavit

14. The Implant Specimen Image

15. Dr.Staninger's Report on the Implant

16. Prayer for Relief

17. Designation of Trial and Request for a Bench Trial

## 1. **COMPLAINT**

Plaintiff alleges the following actions were illegally taken against him:

1. Non-Consensual Implantation of Sub Cutaneous Devices
2. Intellectual Property Theft
3. Non-Consensual Human Experimentation
4. Conspiracy to Murder
5. Conspiracy to Torture
6. Violation of Plaintiff's Civil Liberties, Human Rights and Civil Rights
7. Conspiracy to Violate Plaintiff's Civil Liberties, Human Rights and Civil Rights
8. Forced Drugging
9. Theft
10. Aggravated Assault and Battery
11. Chemical Poisoning or using Biological Agents to Poison
12. Intentional and Purposeful Inflection Of Emotional Distress
13. Crimes Against Humanity barring any Statute Of Limitations
14. War Crimes Weaponry Violations
15. Violations Under the Foreign Intelligence Surveillance Act
16. Terrorism
17. Violations Against Plaintiff by other persons in government funded entities, corporations, business, groups, individuals, with agendas, corruption and more, per USC Title 18, Section 1512 that includes the Plaintiff's personal and tangible property, including Plaintiff's mail. Plaintiff's career prospects and health have been compromised.
18. Violations under the RICO (Racketeer Influenced and Corrupt Organizations) Act

## 2. SUBJECT MATTER JURISDICTION AND GROUNDS FOR FILING

A substantial part of the events giving rise to the alleged claims by Plaintiff, occurred within the jurisdiction of this court, and Defendants are located nationally and internationally.

This court has jurisdiction over the Plaintiff's complaint because it arises under the laws of the United States of America. The Plaintiff's case belongs in federal court under diversity jurisdiction because the Plaintiff does not live in the same state as some of the Defendants.

Title 42 U.S.C. SECTION 1985 – CONSPIRACY TO OBSTRUCT JUSTICE AND INTERFERE WITH CIVIL RIGHTS

Title 42 U.S.C. § 1983, 1985, 1986, 1987 CIVIL RIGHTS AND WHISTLE BLOWER CASE LAWS

UNDER THE COLOR OF STATE LAW, DEPRIVED THE PLAINTIFF OF RIGHTS SECURED BY FEDERAL LAW OR THE CONSTITUTION

Title 28 U.S.C. § 1331 DISTRICT COURT SHALL HAVE ORIGINAL JURISDICTION OF A LAWSUIT ARISING UNDER THE CONSTITUTION, LAWS, OR TREATIES OF THE UNITED STATES

Title 28 U.S.C. § 1332(a)(1) A LAWSUIT BETWEEN CITIZENS OF DIFFERENT STATES

Title 28 U.S.C. § 1367 – SUPPLEMENTAL JURISDICTION

Title 28 U.S.C. § 1391(b)(1) JUDICIAL DISTRICT AND VENUE

This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 in that this action arises under the Constitution, laws, and or treaties of the United States. This Court also has jurisdiction over state claims in that the additional claims for relief are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article II of the United States Constitution. 28 U.S.C. § 1367.

Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) and founded on (1) Plaintiff's information and belief that some of the Defendants are located in this judicial district; (2) "a substantial part of the events, or omissions giving rise to the claim occurred" in this judicial district; and (3) "a substantial part of property that is the subject of the action is situated" in this judicial district.

### 3. FED. STATUTES AND ADDITIONAL VIOLATIONS INCLUDED IN THIS COMPLIANT

Additional Federal and State Statutes/Laws and Violations including Constitutional Violations, Civil Rights Violations, Civil Liberties Violations, and Human Rights Laws/Violations, among others that apply to this complaint.

18 U.S.C. 1961 – All Definitions

22 U.S. Code § 7102 – All Definitions

18 U.S.C. 1962 — Prohibited racketeering activities

18 U.S.C. 1963 — Criminal penalties

18 U.S.C. 1964 — Civil remedies

18 U.S.C. 1965 — Venue and process

18 U.S.C. 1965— Expedition of actions

18 U.S.C. 1967 — Evidence

18 U.S.C. 1968 — Civil investigative demand

32 CFR 37.1310 –– Intellectual property

Title 22 U.S.C. 7102 (6) Involuntary servitude

Title 22 U.S.C. 7102 (3) Coercion

Titles 18 U.S.C § 1961(1)(a)(b)(c) RACKETEERING INFLUENCE CORRUPTION ORGANIZATIONS

Titles 18 U.S.C § 1962(a)(b)(c)(d) RACKETEERING INFLUENCE CORRUPTION ORGANIZATIONS

Titles 18 U.S.C § 1964(a), 1951(a) RACKETEERING INFLUENCE CORRUPTION ORGANIZATIONS

Title18 U.S.C. § 241 CONSPIRACY AGAINST RIGHTS

TITLE 18 PART I CHAPTER 37 § 793. Gathering, transmitting or losing information

18 U.S.C. § 2422 Coercion and enticement

18 U.S.C. § 2510 and 18 U.S.C. § 2511 intercepting communications

18 USC 213 Illegal Surreptitious entries

10 USC 921, Article 121 –– Larceny and wrongful appropriation

Title 18 U.S.C. § 242 DEPRIVATION OF RIGHTS UNDER COLOR OF LAW

Title 18 U.S.C. § 247 OBSTRUCTION OF PERSONS IN THE FREE EXERCISE TO RELIGIOUS BELIEFS

Title 18 U.S.C. § 226 (1a) INTERSTATE STALKING

Title 18 U.S.C. § 249 HATE CRIMES ACT

Title 18 U.S.C. § 1927 THROUGH 18 USC 1968 (RICO RACKETEERING, INFLUENCE, CORRUPTION, ORGANIZATION ACT

Title 18 U.S.C. § 1901, 1905, 1911, 1952, 1956, 1957, 1960, 1961, 1962, 1963, 1964 (RICO) CIVIL RICO – CONTINUOUS CRIMINAL ENTERPRISE ACT (CCE)

Title 18 U.S.C. § 25 IMPARTING OR CONVEYING FALSE INFORMATION, OBSTRUCTIVE MEDICAL RESEARCH, DECEPTIVE PRACTICES, GHOST WRITING (the

use of any false writings), FRAUD, MALFEASANCE, PREMEDITATED and pre-planned crimes, INFLICTED TORTURE, AND CRIMINAL FRAUD

Title 18 U.S.C. § SEC 1509 IMPEDING DUE EXERCISE OF RIGHTS BY ATTEMPTING TO PREVENT, OBSTRUCT, IMPEDE, AND INTERFERE WITH SAME

Title 18 U.S.C. § SEC 1510 OBSTRUCTION OF CRIMINAL INVESTIGATIONS

Title 18 U.S.C. § SEC 1511 OBSTRUCTION OF STATE OR LOCAL LAW ENFORCEMENT

Title 18 Sections 2261 and 2261A Stalking

18 U.S.C. 1512(a) Obstructions by Violence

18 U.S.C. 1512(b) Auxiliary Offenses and Liability Obstruction by Intimidation, Threats, Persuasion, or Deception

50 U.S.C. § 1809 and 1810 electronic surveillance

18 U.S.C. § 2510 and 18 U.S.C § 2511 Intercepting communications

18 U.S.C. § 2261: US Code - 2261A harassed and transmitted the public (i.e.: their provocateurs) to stalk and harass the Plaintiff inclusive of electronically and tangibly

Title 18 Section 1512(d) Obstruction by Harassment

The United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (G.A. res. 39/46, annex, 39 U.N. GAOR Supp. (No. 51) at 197, U.N. Doc. A/39/51 (1984), entered into force June 26, 1987; Universal Declaration of Human Rights, G.A. res. 217A (III), U.N. Doc. A/810 at 71 (1948); International Convention on Civil and Political Rights, G.A. res. 2200A (XXI), 21 U.N. GAOR Supp..(No. 16) at 52, U.N. Doc. A/6316 (1966), 9.99 U.N.T.S. 171, entered into force Mar. 23, 1976) has been violated as follows:

Defendants have tortured Plaintiff and the prohibitions against torture and other cruel, inhuman, or degrading treatment and the conspiracy to oppress, torture, suppress, is a direct violation of Title 142, Section 1985 Conspiracy to interfere with United States Civil Rights

Crimes Against Humanity – Nuremberg Code (as stated US Department of Health & Human Services web site):

"The voluntary consent of the human subject is absolutely essential. Plaintiff should have legal capacity to give consent; should be so situated as to be able to exercise free power of choice, without the intervention of any element of **force, fraud, deceit**, duress, over-reaching, or other ulterior form of constraint or coercion; and should have sufficient knowledge and comprehension of the elements of the subject matter involved, as to enable

7

him to make an understanding and enlightened decision."

Crimes Against Humanity–Rome Statute of the International Criminal Court
Explanatory Memorandum:

> "…are particularly odious offenses in that they constitute a serious attack on **human dignity** or grave humiliation or a degradation of one or more human beings. They are not isolated or sporadic events, but are part either of a government policy (although the perpetrators need not identify themselves with this policy) or of a wide practice of atrocities tolerated or condoned by a government or a de facto authority. Murder; extermination; torture; rape; political, racial, or religious persecution and other inhumane acts reach the threshold of crimes against humanity only if they are part of a widespread or systematic practice"

## 4. NO STATUTE OF LIMITATIONS

This case belongs in Federal Court under federal question jurisdiction because it is about Federal law(s) and Federal right(s), and crimes against the Plaintiff and crimes against humanity, which have no statute of limitations. The Convention on the Non-Applicability of Statutory Limitations to War Crimes and Crimes Against Humanity agree there are no limitations on claims for these crimes. Article 29 of the Rome Statute of the International Criminal Court states genocide, crimes against humanity and war crimes shall not be subject to any statute of limitations.

## 5. INTRODUCTION AND STATEMENT OF CLAIM

Plaintiff is a person seeking justice for serious and varied crimes in violation of illegal disclosure of Plaintiff's personal information including his biological–neuron–cognitive Metadata. He seeks his right to due process, right not be subjected to the cruel, unusual, inhumane or degrading treatment, punishment or experimentation, coercion, intimidation, violence, enticement, violation of civil, human and constitutional rights and liberties. Plaintiff has suffered violations of a financial nature, including damage to his personal property, career, lifestyle, health and future prospects. These and other violations have many times been perpetrated against Plaintiff "under the color of law." The Plaintiff is under the physical control of the United States Government, and for whatever reason, is being subjected to interrogation, experimentation and torture by the entities affiliated with the government and political, ethnic, racial, religious and community groups.

The Plaintiff came to America with great dreams, plans and hopes for a bright future. Plaintiff is highly skilled, well educated and knowledgeable in many areas. The Plaintiff has never been involved or associated with any political party and has had no contact with any radical or fringe group of any kind. He has never been in contact with any terrorist groups, domestic or foreign, in this or any other country. Despite this, the Plaintiff has been treated as an enemy combatant, implanted with nanomaterial, set up as a Biological Application Program Interface ("BioAPI") and his brain hooked up to a brain–computer interface technology. He has been subjected to remote monitoring using Wireless Sensor Body Network System (US Patent NO. 2013/0194092 A1, Unlocking a Body Area Network). Based on his biological–neuron–cognitive functional Metadata, he has been subjected to narrative–based vicious systematic and repeated coordinated harassment, slandering, attacks, degradation and torture for human experimentation for intelligence collection, war technology testing and evaluation, to gain political and economic intelligence, to use for racketeering, gaming and entertainment. This has been going on for over seven years without regard to Plaintiff's human rights, national and international laws, treaties and conventions. The Plaintiff contends that he is put in a "Man vs Intelligent Machines," plus perpetrators, paradigm where his own biological–neuron–cognitive functional Metadata, is being

stored and processed. This real time Metadata is being used against him in his own daily life in the form of narratives, street theater, harassment, intimidation, coercion, attacks and torture in order to break his will, and to prevent him from functioning and living freely, with the eventual goal of murdering him in an act of genocide.

Plaintiff brings this action for injunctive relief, and eventually damages based on his experience of trauma and injury as a victim of the Defendants from the allegations for which Plaintiff will provide proof, irrefutable evidence, overwhelming evidentiary support, substantial facts, research, and investigation.

## HISTORY/BACKGROUND

> I'm working at N.S.A. Somebody puts a code on my desk, something nobody else can break. Maybe I take a shot at it and maybe I break it. And I'm real happy with myself, because I did my job well. But maybe that code was the location of some rebel army in North Africa or the Middle East. Once they have that location, they bomb the village where the rebels were hiding and fifteen hundred people I never met, never had no problem with, get killed.
> --From the movie, "Good Will Hunting"

Plaintiff became acquainted with Daniel Lee Schmitt ("Schmitt"), a pastor, in January of 2009. Plaintiff discussed with Schmitt current events, the Bible, and Plaintiff's personal life. During the discussions, the topic of the movie, "Good Will Hunting" came up as well as the similarities between the main character and the Plaintiff. In May 2009, Plaintiff helped a friend of Schmitt's, Chris Gunderson with moving, who was living in Bloomington, Minnesota. The Plaintiff was then invited to attend Pastor Schmitt's church.

Plaintiff suspects that, through revelations of the PRISM project, or through the National Security Letters under Patriot Act, NDAA the invitation prompted a FISA warrant against the Plaintiff. The warrant granted access by the government (and its affiliate criminal syndicate) to place the Plaintiff under surveillance to obtain Plaintiff's private information (see Dept. of Defense Directive 5240.1-R DL.1.1.9). The Plaintiff concedes that the initial disclosure of surveillance and private information (biological-neuron-cognitive functional Metadata) may have been done for the purpose of an investigation. However, any subsequent collection of information has no legitimate purpose and was done purely for the sole purpose of collecting neuro-cognitive intelligence achieved through novel applications of neuroscientific techniques and

technologies ("NEURINT"), human intelligence gathering ("HUMINT"), medical testing, torture, political purposes, experimentation, weapons testing, Nano, Neuro technologies development & testing, gaming, entertainment and racketeering.

The Plaintiff has been surreptitiously implanted with war technologies, including nano–hooks, nano–claws, nano–tubes, nano–antennae, nano–particles, and a semi–circular disk in his right eye intended to collect visual data *without his consent*. These nanosensors are being used as BioAPI to establish a direct brain link between the Plaintiff's body and the Defendant's Wireless Sensor Body Network Systems and can transmit and receive Plaintiff's biological–neuron–cognitive Metadata. The Defendants are storing, mapping and perfecting this biological–neuron–cognitive functional Metadata (brain mapping) of the Plaintiff. Specifically they are targeting his free will, intellect and emotions. They are testing and evaluating war/medical/nanotechnologies on Plaintiff. In order for the Defendants to map out all possible scenarios of biological–neuron–cognitive activity, they are required to provoke, harass, and torture the Plaintiff with neutral, adversarial and favorable situations. The result is considerable physical and psychological damage to the Plaintiff's body, his cells and his DNA. More extreme and destructive technologies have been used, including chemical, biological and electromagnetic ("EM") weapons to attack his central nervous system and brain and pernicious tactics like theft of Plaintiff's property, slander, harassment and veiled threats. The Defendants' involvement in this direct and indirect torture is in violation of the United States Constitution. Defendants are experts at hiding their identities so they conduct their abusive activities and threats through undetectable means and in an organized fashion as to be considered terrorism.


## IDEAS TO STEAL OR MINE

In February 2010, the Plaintiff formed a small technology business named EZVIS Tech, Inc. By that time, Plaintiff was already under surveillance, although he was unaware of it. The criminal syndicate was actively searching for a scapegoat. The Plaintiff was vulnerable: single, with no parents and no local social or other support system. Indeed, he was living the life of an exile in a foreign land, unnoticed by authorities as he had no criminal record. He was the perfect candidate for experimentation, intellectual theft and subsequent torture.

The criminal syndicate chose the Plaintiff for his creativity and vulnerability but also for his knowledge. Plaintiff is an inventor, programmer, architect and

historian. The economic espionage committed against the Plaintiff consisted of stealing his ideas, opinions, viewpoint, religious, cultural, social and political beliefs and trading them for profit on the open market. Scenes and dialogue were lifted directly from the Plaintiff's life and planted in the public domain by ghost writers. Plaintiff could spend the day going to work, paying bills, talking to friends, and mention an obscure or long-since retired celebrity. Later, Plaintiff would see stories relating to his activities and remarks in newspapers, magazines, even on television. Topics or celebrities discussed by the Plaintiff would suddenly appear in the nightly news. In one instance, the very morning Plaintiff underwent a colonoscopy the same topic was the subject of David Letterman's opening monologue that night. Plaintiff at first dismissed these coincidences but grew suspicious when he began hearing very specific and unique phrases. These ideas couldn't be copyrighted or trademarked or protected as intellectual property as his biological-neuron-cognitive Metadata is being stored in the Defendants' Remote Neural Monitoring ("RNM") systems.

The biological-neuron-cognitive Metadata information of the Plaintiff is analyzed, processed, simulated and distributed to the White House, government agencies, political parties, government and intelligent operatives around the globe, political players, security companies, corporations, the entertainment and gaming industry operatives, media executives, corporate executives, nonprofit agencies, former intelligence agents, private investigators, defense industry contractors, corporations and individuals. The information is used by the Defendants to arrange "coincidences" for the Plaintiff to see or hear, presumably to set him up for a crime or simply to further torture him. These outwardly ordinary-looking networked forces of groups and individuals, who lack empathy and regard for human life have infiltrated the US government, private and even non-profit sectors as evidenced by Plaintiff's experiences.

All Defendants are associated with and coordinate their actions under the Department of Defense's "Joint Targeting" doctrine on US Persons for human experimentation and intelligence collection. They are responsible for implanting nano technology devices, using war technologies for direct and indirect acts of harassment, terrorism, physical and psychological attacks against the Plaintiff. These nanosensors are designed to attach themselves to Plaintiff's cells. Terrorism is evidenced by attempts to murder Plaintiff using vehicles, chemical attacks, biological agents and directed energy devices, all of which causes an extremely debilitating and destructive environment for

Plaintiff's physical and mental well-being which can lead to diseases such as cancer, heart attacks, strokes, and aneurysms.

Plaintiff implores the court for justice and assistance with investigation to put an end to the human experimentation, intellectual property theft, torture, surveillance and harassment. He is also entreating the court to facilitate removal of the nanomaterial from Plaintiff's body. Plaintiff's plea also extends to unnamed innocent US persons who are unwittingly being used for torture experiments resulting in physical and psychological damage as outlined in the Dept. of Defense Directive 5240.1-r: Procedure 13 ("Human Experimentation for Intelligence Purposes").

The Plaintiff's life can never be the same. The instigators of this menace may be nefarious but they are funded by the US government, which has armed its affiliates like the criminal syndicate with enacted legislation and advanced military war weapons and surveillance capabilities that incites indiscriminate violence, torture and serious bodily injury and allows genocide.

Plaintiff has evidence of blanket radiation and lasers that shoot into his body via "through-the-walls" weaponry that have resulted in cuts, bruises, shingles, and skin discoloration. These attacks are relentless and continue day and night. Sleep is impossible without using shielding and grounding material.

Plaintiff implores the Court to put a stop to research and experimentation programs that are using his body and brain for weapons testing, nanotechnologies, neurocognitive sciences and brain mapping which continue to result in continuing illness to the Plaintiff. If these actions are allowed to continue without consent and without oversight, human enslavement will be the end result. These programs must be defunded and stopped, and the criminals brought to justice.

The Plaintiff endures these attacks and assaults because someone, some entity or group, some government official, a bureaucrat, or agency, has deemed him worthless by virtue of being a vulnerable member of a minority. This experimentation (as per Dept. of Defense Directive 5240.1-R against any US Person) is conducted in one form or another by thousands of agencies, contractors, researchers, weapons handlers, psychologists, behavioral consultants, military and law enforcement trainees. These agents are hiding behind computer screens or covertly working through community policing groups, all for greed, control, power and pleasure. The Plaintiff has been taken as hostage for over seven years by the experimenters, psychologists, the criminal syndicate and their affiliates in the government using war

14

technologies and surveillance devices for RNM of his body. If the government does not intervene, the Plaintiff's life, liberty, future, health, finances, safety and peace of mind, which are already in extremely grave danger will become worse. The Plaintiff's dreams, ideas, aspirations, and his future have been stolen and withheld from him.

## REQUEST THAT RECORD BE SEALED

Based on the imminent danger and likelihood of further harassment and possible interference with Plaintiff's ability to conduct his life, including earning a living, Plaintiff requests that the court seal the court record on this matter.

## CIVIL RIGHTS

Plaintiff is claiming loss of all his civil rights. Such rights are designed to protect citizens from unreasonable searches and seizures and from cruel and unusual punishment. Statutes prevent discrimination based on a person's race, sex, religion, age, physical limitation, national origin, and in some instances sexual preference.

Civil Rights include:

Protection from private (non-government) discrimination (based on gender, religion, race, sexual orientation, etc.)

Ensuring peoples' physical integrity and safety and to make sure people are not forced into labor.

## HUMAN RIGHTS

The Plaintiff's human rights are the rights and freedoms basic to life and liberty. Human rights laws entitle people to equal opportunity employment and the right to work free of discrimination and harassment. Human rights include free speech, freedom of expression, and equality of the sexes, the right to food, work and education. Human rights uphold the dignity and worth of the person.

Plaintiff alleges that all of these rights have been lost to him without due process.

## CIVIL LIBERTIES

Plaintiff's civil liberties are those rights and freedoms given to "the People" by the First Amendment to the Constitution, by common law, and legislation, allowing anyone the freedom to speak, think, assemble, organize, worship or petition without government (or even private) interference or restraints.

These liberties are protective in nature, while civil rights form a broader concept and include positive elements such as the right to use facilities, the right to an equal education, or the right to participate in government.

Plaintiff's Civil Liberties have been lost due this undue targeting of his life.

**THE FIRST AMENDMENT**

The First Amendment guarantees freedom of press, religion, speech, and thought—fundamental individual rights with guarantees from the Bill of Rights. Plaintiff alleges that these rights have been lost to him without due process.

## 6. TARGETING OF PLAINTIFF

In 2015 Plaintiff found the document, DoD Directive 5240.1–R. Later that year he realized that his body & brain were connected to remote monitoring systems and that his life is involved in a dangerous "Man vs Intelligent Machines", plus perpetrators paradigm.

1) In the **DoD 5240.1–R directive**, information is "collected."

"... Only when it has been received for use by an employee of a DoD intelligence component in the course of his official duties ... (and) an employee takes some affirmative action that demonstrates an intent to use or retain the information"

2) In the United States Army Terms (**AR 31025**) the "*collection of information*" is defined as "*The process of gathering information for all available sources and agencies*".

3) In the **United States Signals Intelligence Directive, USSID SP0018** (U) LEGAL COMPLIANCE AND US PERSONS MINIMIZATION PROCEDURES ISSUE DATE: 25 January 2011, the word "collection" is also referenced as

*"(U) Target 9. 16. (0) TARGET, OR TARGETING: See COLLECTION"*

4) Whereas **Merriam–Webster.com** defines "collection":

"*A mass or quantity that has piled up or that has been gathered over a period of time*"

### Plaintiff On Target List

After a complaint was made, Plaintiff was nominated by an individual, a group, a business, a religious entity, an ethnically focused entity and others to the individuals, government agencies, component commanders or the Joint Forces commander's staff for inclusion on the joint target list and placed under surveillance.

### Collection & Dissemination Of Plaintiff's meta data

**Approval:** Department of Justice Legal Counsel, DoD General Counsel, Director of the Defense Intelligence Agency, ASD(P), the Defense Intelligence Agency's General Counsel have all approved Plaintiff for wiretapping, intel collection

**Implantation done on Plaintiff**: RFID/Nano material for BCI, Telemedicine, RNM, RICO

**Meta data collected:** biological–neuron–cognitive metadata, his thoughts, words, activities, visual, bio–metrics, neurocognitive functions and abilities.

## NATIONAL INTELLIGENCE LEADERSHIP STRUCTURE

( Taken from Targeting Manuals)



Figure II-3. National Intelligence Leadership Structure



Figure 1: Collector's Functional View of Intelligence Collection

## 7. HUMAN SUBJECT RESEARCH

The Department of Defense, the largest government agency in the United States, outlines all the details of the campaigns of research, testing and intelligence collection involving human subject in official documents. This document (**DoD 5240.1-R** "Procedures Governing the Activities of DoD Intelligence Components that Affect United States Persons") along with the "Joint Doctrine for Targeting" (JP 3-60 ) contain some vaguely defined words and methods by which individuals, groups, businesses, entities and electronic systems can work together to gather information about a target's life, intelligence and biological-neuron-cognitive metadata and subsequently destroy all aspects of a target's life including health, financial ruin, loss of property, business and relationships

**Human Experimentation For Intelligence Collection and Warfare**

The Executive Order 12333 specifies that "Conduct of Intelligence Activities" that affect US persons be governed by procedures and implemented by the agency heads (**DOD DIRECTIVE 5240.1-R**).

**Excerpts from DOD Directive (In Italics):**

*PROCEDURE 13. EXPERIMENTATION ON HUMAN SUBJECTS FOR INTELLIGENCE PURPOSES*

> *"C13.1. APPLICABILITY*
>
> *This procedure applies to experimentation on human subjects if such experimentation is conducted by or on behalf of a DoD intelligence component. This procedure does not apply to experimentation on animal subjects."*
>
> *C13.2.1. Experimentation in this context means any research or testing activity involving **human subjects that may expose such subjects to the possibility of permanent or temporary injury (including physical or psychological damage and damage to the reputation of such persons)** beyond the risks of injury to which such subjects are ordinarily exposed in their daily lives.*

## Research

Department of Health and Human Services (DHHS) regulations define research at 45 CFR 46.102(d) as follows: *Research means a systematic investigation, including research development, testing and evaluation, designed to develop or contribute to generalizable knowledge. Activities which meet this definition constitute research for purposes of this policy, whether or not they are conducted or supported under a program which is considered research for other purposes. For example, some demonstration and service programs may include research activities*

## Human Subject in Research

The DHHS regulations "Protection of Human Subjects" 45 CFR Part 46, administered by the Office for Human Research Protection (OHRP), define a human subject *as a living individual about whom an **investigator** conducting research obtains: – **Data through intervention or interaction with the individual** or – **Identifiable private information***

## Clinical Research ( NIH)

NIH defines human clinical research as:

*(1) Patient–oriented research. Research conducted with human subjects (or on material of human origin such as tissues, specimens and cognitive phenomena) for which an investigator (or colleague) directly interacts with human subjects. Excluded from this definition are in vitro studies that utilize human tissues that cannot be linked to a living individual. Patient–oriented research includes: (a) mechanisms of human disease,*

*(b) therapeutic interventions,*

*(c) clinical trials, or*

*(d) development of new technologies.*

*19. Epidemiologic and behavioral studies.*

*20. Outcomes research and health services research.*

## ACADEMIC, ORGANIZATIONS, INSTITUTES AND OTHERS PARTICIPATION IN HUMAN SUBJECT RESEARCH

**Executive Order 12333 (excerpts) :**

*Contracting. Elements of the Intelligence Community are authorized to enter into contracts or arrangements for the provision of goods or services with private companies or institutions in the United States and need not reveal the sponsorship of such contracts or arrangements for authorized intelligence purposes. Contracts or arrangements with academic institutions may be undertaken only with the consent of appropriate officials of the institution.*

The following excerpt (in Italics) are from DOD directive 5240.1-R

### *PROCEDURE 11. CONTRACTING FOR GOODS AND SERVICES*

*C11.2.1. Contracts with Academic Institutions. DoD intelligence components may enter into a contract for goods or services with an academic institution.*

*C11.2.2. Contracts with Commercial Organizations, Private Institutions, and Individuals. Contracting by or for a DoD intelligence component with commercial organizations, private institutions, or private individuals within the United State.*

## Research Collaborations Between Universities and the DoD

The following are excerpts taken from the document named "IDA Document D-5230 Research Collaborations Between Universities and Department of Defense Laboratories." It gives details of collaboration research between Universities and the DOD. Some areas fall into the categories of research that the Plaintiff is being used for including experimentation, intelligence collection and the testing of nano devices (wave guides, antennas), High-performance computing, traumatic brain injury and psychological impact and neurotechnologies.

**Excerpts:**

"Federal laboratories have a long history of research partnerships with universities, and these collaborations are viewed as being important to strengthening the nation's research enterprise, particularly in areas related to national security."
Appendix B. Examples of Laboratory-University Interactions

| University Partner(s) | Research Area |
|---|---|
| Rutgers University | Modeling and simulation, bridging the scales, advanced experimental techniques and computational validation, multiscale material metrics, and processing and synthesis (nano engineering) |
| University of Central Florida<br>University of Pennsylvania<br>University of Texas | Creation of autonomous robots that can effectively team with soldier |
| NASA Ames Research Center | High-performance computing |
| University of Southern California | Virtual reality training for traumatic brain injury and psychological impact |
| University of California, San Diego<br>University of Michigan<br>University of Texas at San Antonio | Humans learn and perceive information and interact with man–machine interfaces—neurocognitive performance, advanced computational approaches, and neurotechnologies |
| University of Utah | Electrochemical energy devices, hybrid photonic devices, and heterogeneous metamorphic electronics |
| Purdue University | Energy storage and power management and electronic warfare |

**Continuous Clandestine, Tracking, and Tagging, and Locating (CTTL)**

Excerpts (in italics)

*The Ability to Locate, Track, and Identify Human Beings and Other Important Target*

*Introduce New Capabilities for Detecting, Identifying, and Tracking Targets Based on Unique Observables Natural Signatures: e.g. Biometrics and Unique Mechanical Defects Augmentation of Natural Signatures: e.g. "Perfumes" and "Stains" Extend the Range*

***Nanotechnology***

*Clandestine Devices*

*High Functional–density*

*Devices Self–organizing,*

*Self–deploying Devices Processing and Communications*

*Energy Harvesting*

***Collaborative Execution of S&T***

*DoD Service Laboratories*

*Defense Advanced Research Projects Agency (DARPA)*

*ASD(SO/LIC) Coordinated Investments*

*Intelligence Community Research Organizations*

*DOE Laboratories*

*Organizations –DARPA –Communications–Electronics Research, Development, and Engineering Center (CERDEC) fNight Vision and Electronic Sensors Directorate (NVESD) –Army Research Laboratory (ARL) –National Security Agency (NSA) –Defense Intelligence Agency (DIA) –Air Force Research Laboratory (AFRL) –Department of Energy (DOE) –Industry*

## IMPLANTATION OF SUBCUTANEOUS DEVICES

The following excerpts are from DoD Directive 5240.1-R

**Excerpts (In Italics):**

> *"C5.5.1. Applicability This part of Procedure 5 applies to developing, testing, or calibrating electronic equipment that can intercept or process communications and non-communications signals. It also includes research and development that needs electronic communications as a signal source."*

The general definition of term "non–communications signals" mentioned above:

> *"the electrical signals generated by organisms in the course of life are not generated with the purpose of communicating the state of the organism to an external sensor"*

## Clinical Research: Telemedicine

Medicare defines telehealth services (42 CFR 410.78). Note that the federal Medicaid statute does not recognize telemedicine as a distinct service.

"Telemedicine seeks to improve a patient's health by permitting two–way, real time interactive communication between the patient, and the physician or practitioner at the distant site. This electronic communication means the use of interactive telecommunications equipment that includes, at a minimum, audio and video equipment." (see pic below, courtesy: yahoo )



The Plaintiff is implanted with nano technologies, including nano-hooks/claws/tubes/antenna/waveguides and a semi circular disk in his right eye intended to collect biopotentials and visual data.

Several Implanted miniaturized body sensor units together form a body area network ("BAN"). Devices like laptops, cell phones and others part of personal Area Networks ("PAN") act as a gateway, to view and manage BAN applications. A local area network ("LAN") system can use PAN wireless technologies as gateways to reach longer ranges. Through gateway devices, it is possible to connect the devices in the human body to the internet. This way, medical and other professionals can access Plaintiff's body online at any time they wish.

## Telepharmaceutical/Weapons Testing

Testing and evaluation of war/medical/nanotechnologies using implant neuro stimulators. The result is considerable physical and psychological damage to Plaintiff's body, neurons, cells and his DNA.

More extreme and destructive technologies have been used, including chemical, biological and electromagnetic ("EM") weapons to attack his central nervous system and brain

Anyone with the personal access codes to Plaintiff's implants are able to operate them by cell phone or any other electronic device over the internet.

## 8. HUMAN EXPERIMENTATION ON PLAINTIFF

## A. PROCEDURE 2. COLLECTION OF INFORMATION ABOUT UNITED STATES PERSONS

**DoD 5240.1–R**

> *C13.2.3. Human subjects in this context includes any person whether or not such person is a United States person. Heads of DoD components shall issue such implementing instructions as may be necessary for the conduct of authorized functions in a manner consistent with the procedures set forth herein on "unwitting" US persons and those who grant consent to conduct human experimentation on their body;* **those who are placed under surveillance**

Defendants "DoD Components" unlawfully implanted Plaintiff with nanosensors in order steal his NEURINT, HUMINT through non–consensual experimentation using harassment, trafficking, torture and weapons testing with the intent to slowly murder him.

Plaintiff, while living in Bloomington, Minnesota was in the early stages of being targeted and was unaware of the inhumane violence being incited by the DoD private contractors, criminal syndicates, community groups, law enforcement (current and former), civilian sleeper cells, private security and investigative agencies, commercial organizations, RICO and individuals. After a series of unlikely incidents, Plaintiff began to suspect that he was experiencing severe health problems due to stress. He also became conscious of seemingly random people harassing him in unusual ways. At the time, the he was not aware of any directive like 5240.1–R, Executive Order or a Letter being used to unlawfully and unethically target and experiment on him for intelligence collection, intellectual property theft and nefarious purposes through loosely affiliated or interconnected groups and compartmentalized systems for targeting and the criminal syndicates.

Later in 2010, Plaintiff was subjected to horrible staged accidents and harassment, all of which coincided with the international events known as the "Arab Spring." As a minor, the driver did not face very serious charges. Plaintiff then began to notice vehicles driving erratically and aggressively, passing him at high speeds, cutting him off and blocking him. He continued to be harassed and mobbed by vehicles wherever he went, whether on the road or near intersections.

The vehicles had graphics correlating to words, phrases, colors, numbers, events, metaphors, and images from his public as well as private conversations, thoughts, his actions and reactions. Perpetrators were placed at strategic locations, like intersections, behind buildings, malls, grocery stores, commercial buildings, fast food places, and on highways, to constantly surround the him.

In 2011, the Plaintiff called FBI offices in Minneapolis and Rochester about the Organized Group harassment and traffic violations. He also inquired if he was under surveillance for any reason. They responded, saying that they wouldn't reveal any surveillance he may be under and referred him to the local police. In September 2011, a blue Honda sedan sped through a red light as the Plaintiff was making a left turn on a green arrow signal. Plaintiff immediately had to brake suddenly to avoid a life-threatening collision. In October 2011, a white male in a parked vehicle photographed the Plaintiff walking towards his car at a Hy-Vee store in Rochester. In early November 2011, in Bloomington, the Plaintiff was nearly hit by a van that suddenly backed up toward the Plaintiff. Plaintiff on his first day of work in Rochester, a blue Dodge Ram tried to sideswipe the Plaintiff's vehicle several times, forcing him onto the shoulder and almost off the road.

In November 2011, he went to the Bloomington police and reported the organized stalking, stalking by proxy, and harassment, including documents and license plate numbers as evidence. The officers told him they would be willing to call an ambulance and he was escorted out of the station.

In 2012, as the assaults and harassment intensified, the Plaintiff filed another police report and provided video and photographic evidence to the police of these acts against him. No investigation was done. As the electronic attacks, harassment and stalking increased, Plaintiff's health continued to deteriorate. EMT vehicles and sirens began appearing immediately after Plaintiff got on the freeway and quickly cut him off. Whenever there was news of devastation, destruction or a criminal act like shooting, bombing, or natural catastrophes like earthquakes occurred, perpetrators would drive more aggressively around Plaintiff, deliberately provoking him in red cars intended to intimidate, setup, create "anchors" of fear, and stress.

In July 2013, Plaintiff filed a formal complaint with the Governor of Minnesota, the Attorney General of Minnesota and with Minnesota State Senators in hopes of stopping the escalating attacks, assaults and damage to his health, but the harassment, electronic attacks only got worse. Defendants neglected to investigate

Plaintiff's initial complaints, causing deep emotional distress to him.

Between November 2011 and August 2013 the Plaintiff submitted 10 resumes for employment. Unlike past submissions, none of his resumes were selected for an interview. Even Mayo's vendor company was puzzled as to why Plaintiff was not picked up or at least interviewed for a position. The pattern repeated itself with other employment agencies. Even when Plaintiff was able to obtain and passed several interviews, he was not hired.

In May 2013, the Plaintiff pulled into a Walgreen's parking lot in Bloomington, MN. A red van followed him, pulled diagonally across multiple parking spaces and parked, seeming to wait for Plaintiff. The driver opened his door but never left the van. When the Plaintiff returned to his car from the store, the van driver immediately took off. In June 2013, while in Madison, Wisconsin, a driver deliberately attempted to run into the Plaintiff. Plaintiff provided the Madison police with video evidence of the incident.

In August of 2013, Plaintiff was forced to move from Bloomington, Minnesota (where he lived for over five years) to a temporary place in Rosemount, Minnesota and eventually to into an apartment in Eagan, Minnesota where he was again subjected to severe harassment and attacks by direct energy & chemical.

In September, 2013, Plaintiff passed three interviews for a contract job at Menard's. Recruiter said a contract document was forthcoming. Later in the week the recruiter sent the following email to the Plaintiff: "I don't know how to say this easily, but it looks like Menard's has had a change in resources. They had just re-shifted, re-organized their IT staff and no longer have any current needs at this time. So there will be no further immediate interviews at this time. So that is off the table for now."

The Plaintiff started a contract job with the US Postal Service in November 2013. The harassment began to accelerate at his workplace and seemed to be fueled by details from his personal life. He would overhear coworkers talking about things with reference to Plaintiff's private conversations, things he did at home, data from his cell phone and emails, the books he read, the movies he watched and even the websites he visited.

On November 29, 2013, Plaintiff experienced a break in at his apartment, a signal to him that he was not secure in his home and that he was being watched. This was reported and written up by the Eagan Police, but because little was taken (however

the items were strategic, to alert him to the theft – a case of Coke, which he grabs a can of Coke as soon he gets back from work), they had trouble following up on it. In March 2014, Plaintiff installed a security system within the apartment.

The street theater, and provocative, criminal actions directed against Plaintiff were driving him towards cognitive dissonance, negative conditioning and hopelessness. On January 3, 2014, an attempt to run him over was made by a car in the crosswalk at Byerly's grocery store in Eagan, Minnesota. A driver was sitting in a car near the stop sign, when the he stepped into the crosswalk. When he was halfway across, the driver suddenly accelerated and narrowly missed hitting him. The following week he contacted Eagan police officer Allison Burstein, and told her what happened and requested the police obtain the security tapes from the grocery store to support his allegations. Officer Burstein refused to request the tapes, saying no major incidents had taken place.

In November 2014, the Plaintiff went to the Eagan police to talk about the harassment. Plaintiff was waiting in a room with the door open and overheard an employee walking in and saying to the receptionist, "He forgot his medication." After waiting for quite awhile, an African-American police officer asked Plaintiff if he was on any medication and if he thought people were "out to get" him. In December 2014, he returned to his apartment after a couple of days in Troy, Michigan. His apartment had a foul smell and he learned that his apartment had been entered on the pretext of maintenance. The alarm had been turned off and he also found a bottle of green gel in it on his bedroom floor. Plaintiff became sick with severe muscle spasms for the next few days. A few months later, he returned home to a notice left by management on his kitchen counter. The alarm system had been turned off once again.

In March 2015 Plaintiff's refrigerator brakes down and destroys all the food Plaintiff purchased the previous day. Apartment maintenance replaces the unit and for the next few days Plaintiff is violently sick with severe muscles spasms.

In April 15, 2015 Plaintiff's refrigerator breaks down again, and ruins all the food purchased the previous day. As in the March 15 incident, building management replaces the appliance and Plaintiff becomes sick with severe muscle spasms for the next few days

In May 2015, Plaintiff found a container of ground coffee in his cupboard. He

does not own a coffee maker and therefore does not purchase coffee. He called the police and reported the details of this cryptic incident. He was referred to the building manager. The manager stated that as far as management was aware, there had been no activity in Plaintiff's apartment. At the time, Plaintiff didn't understand the obvious denial of such targeting acts. He has learned that this tactic is known as "gas lighting." The perpetrator commits criminal or nonsensical acts which, when the victim reports them, makes the victim seem delusional.

The number of close calls while Plaintiff is driving is becoming much more than coincidences and are frightening as Plaintiff doesn't know where and when the next attempt will occur. The Plaintiff began to experience severe levels of pain, stress and fatigue contributing in detrimental way to his health. Plaintiff consulted medical professional during this period hoping to get some relief. In 2015. Please see the Plaintiff's primary care physician report (see letter, dated 05/14/2015, on Page 44).

In June 2015, Plaintiff's wallet was stolen from the YMCA in Eagan. The wallet contained cash, Plaintiff's IDs, debit cards, a Social Security card, US Government Card, Canadian PR card and Plaintiff's $600 cell phone. Officer Steve Lonsbury of the Eagan Police Department took the report. Plaintiff told the officer that he had placed his gym bag in an unlocked locker, but the incidence report was altered to read, "his duffle bag which was unsecured and left on a bench in the locker room.". Since the incident, the Plaintiff called the officer and left him numerous messages. To this day, the officer has failed to return any of Plaintiff's calls.

in October of 2015, the Plaintiff's vehicle tire was tampered with and, rather than meeting his date, he spent two hours on the road fixing the tire

In December 2015, a black Chevy SUV (partial license plate #xxx–JVX) ran a red light while Plaintiff had green and narrowly miss hitting him. Location: Highway 63 and Highway 14, in Rochester, Minnesota.

In January 2016, Plaintiff came out of Walmart and sees a white SUV waiting near a crosswalk. As Plaintiff begins to cross, the driver lurches forward, narrowly missing the Plaintiff.

In April 2016, Plaintiff again went to the Eagan police station and met with

Officer Ryan and described once again to him about the ongoing harassment and damages to Plaintiff's property.

May 30, 2016, a woman looks at Plaintiff and makes gestures through the glass window of the gym where he was working out and using a loud voice asks Plaintiff to open the door. Plaintiff points out the other door that was already wide open. Then she comes through the other door and begins to shout at Plaintiff because he didn't open the door.

One night in June 2016, a police officer from the Eagan Police knocked on Plaintiff's door shortly after the midnight. The Plaintiff opened the door and the officer said he was looking for 'Cassandra.' Plaintiff told him nobody with that name lived there and the officer left.

In July 2016, Plaintiff parks his vehicle in front of his apartment building on the south side. When he returns, Plaintiff discovers that his vehicle was tampered with and the side mirrors were pushed towards the door.

In November 2016, Plaintiff received a call from Wells Fargo fraud detection about fraudulent purchases made on his account. Plaintiff had to cancel the card and apply for a new one. The Plaintiff went to a social dance event in Rochester Minnesota. After the event, around 11 PM, Plaintiff came out to find out his vehicle tire was deflated.

Between the last week of December 2016 until the end of January 2017, Plaintiff's apartment heating was sabotaged, and he had to live in cold.

In February 2017, Plaintiff was attacked with DEW/NLW and suffered from fatigue, hot flashes to his head and body, chest pressure, muscle pain and inability to breath.

In March 07, 2017, Plaintiff was severely attacked with DEW/NLW, Stingray, poisons and suffered from fatigue, hot flashes to his head and body, spinal cord pain, muscle pain and inability to breath. He was unable to properly control of his hands for days, experienced a persistent headache, drowsiness and circulatory problems. He had painful feet, painful legs, and loss of erection. Similar attacks continued to intensify until today.

Vehicular mobbing of Plaintiff is constant and widespread, on the road, near intersections, nearly everywhere he goes. Vehicles exhibit special, meaningful signs, words, phrases, colors, and numbers related to events, images and sounds that originate from within the privacy of his home. These displays have occurred over and over. They increased significantly during news of shootings and terrorist attacks as a way to warn and threaten Plaintiff. Plaintiff realized he was becoming sensitized. Suddenly and without warning, there would be more EMT vehicles and sirens surrounding his car. Suspicious people (later identified as Defendants and their operators) were placed at strategic locations like intersections, behind buildings, malls, grocery stores, fast-food places, and highways. Not only would they swarm the Plaintiff, they would flagrantly violate traffic laws, cutting him off in traffic, driving in the wrong direction towards him, in cars with out of state, fake or expired license plates. He was subjected to random, chaotic and hostile environment through the tactics known as "street theater" and "choice references" based on previous biological-neuron-cognitive metadata

The above-mentioned incidences constitute only the tip of the iceberg of the torture experienced by Plaintiff. It would take thousands of pages to completely document the harassment and torture experienced by him.

To this day perpetrators continue to stalk, harass, attack, sabotage Plaintiff's vehicle, his electronic equipment, steal and throw trash in Plaintiff's area.

C. PROCEDURE 7. PHYSICAL SEARCHES

**Excerpts (In Italics):**

> *"Physical search means any intrusion upon a person or a person's property or possessions to obtain"*

> *"however, request the FBI to conduct such searches."*

Plaintiff's apartment was broken into at least five times. On one occasion, a case of Coke was taken. The value was insignificant, but the significance of the intrusion and message it sent was chilling. His vehicles were broken into, tampered with numerous times, items placed in the car and tires were damaged.

D. PROCEDURE 8. SEARCHES AND EXAMINATION OF MAIL

**Excerpts (In Italics):**

> *"This procedure applies to the opening of mail in United States postal channels, and the use of mail covers with respect to such mail, for foreign intelligence and counterintelligence purposes."*

In Bloomington and Eagan, Minnesota, people intercepted, opened, tampered with and delayed the Plaintiff's mail. Plaintiff would mail monthly payments to Comcast, Sprint, Macy's, etc. and they would be delayed or never received, forcing him pay late fees. After five years of manipulation, theft and destruction of his mail, the Plaintiff was to forced rent a mailbox. Even that was not impervious to tampering.

## E. PROCEDURE 10. UNDISCLOSED PARTICIPATION IN ORGANIZATIONS

**Excerpts (In Italics):**

> *C10.2.2. The term organization includes corporations and other commercial organizations, academic institutions, clubs, professional societies, associations, and any other group.*

> *C10.2.4. Participation refers to any action undertaken within the structure or framework of the organization involved.*

While working for the USPS and Delta Airlines, Plaintiff was not aware of any "undisclosed participation" by the Defendants, DoD Components agents, who were pre-positioned or recruited at his work place. He began to notice a pattern of harassment by the coworkers who would parrot words taken from his private conversation. They would wait in the parking lot at work, follow, and drive recklessly around him as he walked to and from his car. Plaintiff's contract jobs were terminated without reasonable cause or explanation.

## F. ELECTRONIC SURVEILLANCE AND MONITORING

Excerpts (In Italics):

### *PROCEDURE 6. CONCEALED MONITORING*

> *"C6.2.1. Concealed monitoring means **targeting** by electronic, optical, or mechanical devices a particular person or a group of persons without their consent in a surreptitious and continuous manner. Monitoring is surreptitious when it is targeted in a manner designed to keep the subject of the monitoring unaware of it"*

Defendants have placed Plaintiff under illegal pervasive electronic surveillance since the covert and overt targeting began in April 2010. Plaintiff, who believed in the Constitution and the rule of law, never suspected his own government through its "components" would illegally monitor and target him. Plaintiff began to receive phone calls from unknown people and emails from recruiters for jobs not related to his profession. In March 2011, after receiving unwanted and derogatory text messages from Defendant David H. Wade, Plaintiff blocked the sender's number. In April the Plaintiff began to receive prank calls and phone calls from "unknown" (no display of number on the phone) numbers. When reported to Sprint, they said they couldn't trace the numbers. In May 2011, Plaintiff talked to his family and friends and mentioned the word "California." After the call ended, he immediately received a spoofed phone call from a number in California. Later he began to receive phone calls from telemarketers, businesses, and people linked to the names and words and taken out of context from his private phone calls. Initially, the Plaintiff did not think much of these coincidences. Later, when the words spoken in his native language began triggering spoofed calls, Plaintiff again reported these incidents to Sprint. Plaintiff was forced to explain these coincidences to dubious customer service agents, who simply advised him to reset his phone. After doing so, the harassment continued.

Later in 2011, Plaintiff called the Bloomington police about his phone conversations being intercepted, the dispatcher sent a squad car to his home. He was asked if he was on any medication. The Defendant again proved they had no intention of investigating his complaints. The Plaintiff continued to receive unknown phone calls synchronized with specific conversations or events in his life. As the phone

harassment became more intrusive and stressful, Plaintiff again reported the incidents to Sprint and asked them to do an investigation. He was advised that a police report would be required before Sprint could do anything.

Thereafter Plaintiff began to notice his Internet activity being intercepted, redirected to fake sites and most importantly, subject to "key logging." Plaintiff reported the matter to his ISP, Comcast and they advised him to get a software firewall and anti-virus program but the interception continued. Later that summer Plaintiff's laptop was attacked by a virus, which destroyed the boot sector. In 2012, Plaintiff purchased a new laptop that was again infected and damaged by a virus. In 2013, Plaintiff once again bought a new laptop that was sabotaged by a virus deployed by the Defendants. In January 2014 after another severe virus attack, the computer repair team Geek Squad detected an unknown device on his private home network. Plaintiff again complained to Comcast (Eagan) about Internet traffic interception and network intrusions. After merely resetting the router, the interception continued. The Plaintiff called the Defendant, City of Eagan Police to report these incidents and was told they did not have tools do computer forensics.

Defendants are responsible directly and indirectly for implanting and continuing to commit torment and torture against the Plaintiff for technological, political and economic gains. Approved by various Senate and Appropriations budgets for billions of dollars to be paid to corporations, academic institutes, research labs, contractors, agencies and to allow the use of military surplus war weapons and using chemical and biological agents to inject disease, trauma, cancers, strokes, aneurysms, in an unethical, non-consensual and inhumane experiments in order to test and perfect the technologies. The Plaintiff comes to this court to plead for assistance to stop the illegal inhumane treatment of Plaintiff's body and mind in these acts of non-consensual human experimentation and torture. Plaintiff continues to suffer denial of regular medical services for MRI/CT scans due to implantations.

## 9. PLAINTIFF PROPERTY SABOTAGED, VANDALIZED AND ATTACKED

In 2010, Plaintiff was living in Bloomington, Minnesota. His car suddenly began to have numerous problems that were not consistent with its age. This continued into 2011 and made it extremely difficult for the Plaintiff to continue his daily commute. At this time he was also experiencing severe harassment while driving (detailed elsewhere) and he bought a new car. After only a month, he noticed damage to the paint around the door handle.

In 2011 Plaintiff's two-year-old laptop was hacked into and attacked and rendered inoperable.

Plaintiff's laptop was attacked and the Windows Operating System was rendered corrupted.

In 2012, Plaintiff purchased a dash camera. It was mysteriously damaged and disabled after only a few months.

In 2012, Plaintiff's new laptop was attacked, and he was forced to buy a new one which was also hacked.

In May of 2012, Plaintiff's car tire was slashed and flattened.

In 2012, Plaintiff purchased a Tri-field meter and it too was attacked and damaged.

In 2013, Plaintiff was forced to move. His computer was hacked, despite taking defensive anti-virus measures.

In 2013, Plaintiff's apartment was broken into and his items taken. Plaintiff reported the matter to police.

In January, February and April of 2014, Plaintiff's three-year-old car broke down three times.

In January 2014, Plaintiff's laptop was attacked and disabled. A technical support service person (from The Geek Squad) discovered a new, unknown device in Plaintiff's network settings.

In February 2014, the Plaintiff's parked his car in front of the Social Dance Studio in Minneapolis. When he returned to his car, he saw that someone had smashed

the windshield.

In 2014, Plaintiff bought a new external hard drive, and found after a month that it was disabled

In May 2015, Plaintiff's car wouldn't start and had to be towed to the dealership.

In June 2015, Plaintiff's wallet with bank cards, SSN card, cash and a new cell phone was stolen.

In December 2015, Plaintiff's new Acoustic Jammer was attacked and disabled.

In July 2016, Plaintiff's vehicle side mirrors were tampered with.

On September 10, 2016, Plaintiff's vehicle tires were tampered with one tire deflated.

On November 11, 2016, Plaintiff went to a social dance event in Rochester, Minnesota. After the event, around 11 PM, Plaintiff came out to find out his vehicle's tire was deflated. Same day Plaintiff was notified of fraudulent transactions worth hundreds of dollars from his debit card.

In November 2016, Plaintiff's bracelet worth $300 and sun glasses worth an additional $300 were stolen from his car. Plaintiff found black foot prints in his parking space in the underground garage at his apartment complex.

In February 2017, Plaintiff was notified of fraudulent transactions worth hundreds of dollars from his debit card.

In June 2017, Plaintiff was once again notified of fraudulent transactions worth thousands of dollars from his debit card.

August 2017 Plaintiff's vehicle tire was deflated.

To this day, perpetrators continue to stalk, harass, attack, sabotage Plaintiff's vehicle, his electronic equipment, steal and throw trash in Plaintiff's area.

## 10. INTELLECTUAL PROPERTY THEFT

Plaintiff grew up in India and he was raised by God–fearing parents who, although poor, had high standards. They never committed crimes, they abstained from alcohol, and obeyed both civil and religious laws without exception.

Plaintiff is knowledgeable in a wide range of areas, from engineering and technology, to cultural, social, religious, ethnic and political disciplines. He can read, write and speak three languages. He has never used drugs, nor has he intentionally violated any laws. Although an adult, Plaintiff became an orphan, making him vulnerable, and thus the perfect scapegoat for experimentation

In the past seven years—and continuing to this day—Plaintiff's intellectual property has been stolen by the corporate and government entities, contractors, military agencies, researchers, scientists, script writers, cinema and media personnel.

Plaintiff's company represented an attractive target. As a software designer/ programmer, his designs of software applications have been stolen, simulated and sold for political, economic and social purposes.

## OPEN SOURCE INTELLIGENCE

Plaintiff maintains a social media account and the postings on said account and all other Internet activity is being rerouted. Through this Computer Network Exploitation ("CNE"), Plaintiff's social life, online life, relationships, online activities and interactions are being monitored and recorded. This information is valuable for concocting the short stories, scripts and movies that make up "street theater" operations. When Plaintiff has tried different computer protection softwares, firewalls, and anti–virus protections to prevent this theft, his computer was hacked, attacked and damaged, most likely though a backdoor provided by his ISP, Comcast. Hacking has made it possible to record every keystroke, every mouse click and every web page or image viewed by him.

## Theft of trade secrets

Perpetrators have gained knowledge of Plaintiff's trade secrets by non–consensually implanting him with nanotechnology, allowing them to steal his biological–neuron–cognitive metadata, his will, intellect, and knowledge. These activities are occurring

around the clock, seven days a week.

## 11. EXTRAORDINARY CIRCUMSTANCES CALL FOR CAREFUL DISCRETION BY THE HONORABLE COURT

The crimes against Plaintiff involve high tech military grade equipment, weapons and manpower.

Plaintiff is a first generation, legal immigrant from an ethnic, religious, social and cultural minority.

Plaintiff has overt and covert groups stalking him, and has experienced electronic, physical and psychological harassment, Microwave and chemical attacks to his body since early 2011. However, it was not until the Fall of 2015 he was made aware of the automated tracking, locating and attacking systems that were being used against him. This was along with remote monitoring systems that were being used by the Body Area Network systems using civilian and non-civilian sleeper cells. These cells were engaged in harassment, weapons testing and live experimentation.

In 2011, after a series of inexplicable daily incidents and unlikely occurrences, Plaintiff began to notice he was being followed, watched and harassed by random people everywhere he went.

In October 2011, the Plaintiff consulted an Electronic Countermeasures Investigator to sweep his apartment for bugs. The sweep did not detect anything tangible except some intermittent signal coming from within a mile. In 2012, Plaintiff again consulted a private investigator and bought a dash cam for his car, GPS detectors and an EMF meter to detect the microwave attacks. Some readings were detected, however DEW attacks damaged some of the meters and cameras. Plaintiff continued to do research and has had the private investigator run background checks on vehicles involved in swarming, mobbing, stalking, aggressive & dangerous driving incidents he found himself involved in.

In late 2012, Plaintiff was walking to McDonalds (1.5 miles from his apartment). He had no electronic devices with him but he was followed and harassed by people on the way to the restaurant, inside and then back home.

Between 2011 until the present, Plaintiff has spent thousands of hours of

research and investigation into the mechanics of surveillance, psychotronic technologies, chemical and biological weapons on his own with an occasional help of a private investigator. Plaintiff realized that **tracking down and investigating the offending frequencies and radiation levels** is key to finding the entities, groups, organizations and individuals behind the surveillance and "no-touch" torture. Plaintiff bought various meters for recording the tracking frequencies and EMF radiation levels and has also tried to shield himself from the radiation. None of these efforts helped significantly and Plaintiff realized it would cost millions of dollars for spectrum analyzers, and to shield against military war technologies, something he is not capable of affording.

In 2014, Plaintiff found an industrial toxicologist through an online victims forum. Bio resonance testing by Dr. Staninger in March and September, 2015, detected nano and infrared material in his body. However, most medical doctors and healthcare professionals are not familiar with these types of implant technologies.

In 2015, with the help of another victim he found Melinda Kidder, a certified Private Investigator in Missouri who specialized in a type of body scanning called H-SCADA (Supervisory Control And Data Acquisition) (http://www.columbiainvestigations.com). According to Ms. Kidder's report dated September, 2015 "The RF Signals scan for Birapaka ..showed the following signals **2550.079, 2545.926, 2543.165, 2542.624**... It should be noted that these signals were ambient at the time of the scan and were not necessarily coming from, but may have been directed towards him. These signals were not present prior to his arrival, or after his departure from the assessment location."

Plaintiff, even though he continued to suffer from the ongoing bombardment, still didn't have specific defendants identified. Dr. Staninger suggested detoxification methods to get rid of nano material. In December of 2016, Plaintiff found Dr. Kolb who was willing to do an implant removal, that's when Plaintiff filed the case.

On March 31 2017, Plaintiff underwent a successful surgery to remove a

nano bio-sensor implant from the posterior right ear.

In April, 2017 the implant was sent to Dr. Staninger for analysis, who produced a report naming the patents, manufacturers, researchers, and the users tied to the nano implant removed from Plaintiff's ear.

As a result of criminal use of electromagnetic neuro stimulators, radiation, chemical, and biological attacks, and other unethical, inhumane and unknown military technologies and devices, war weaponry, and government-funded research have been directed at Plaintiff's body, he has developed severe fatigue, neck, spinal cord and muscle pain, and damage to other vital organs of his body

Plaintiff asks the court to realize these are extraordinary times , and when he comes before the court with the types of allegations he is making, it takes time to gather the proof. These facts call for wise, careful, prudent discretion by the court to allow pro se plaintiff time to develop his case, and present evidence concerning, torture, experimentation and intellectual property theft, which are part of much broader scheme that impacts all US citizens and continues to take place, unchecked. Despite being afflicted with electronic, psychological and physical harassment, trauma and torture 24 hours per day for over seven years, Plaintiff continues to endure the torture patiently because he values every single innocent human life and wants to get the unlawful experimentation stopped.

Plaintiff also asks the court's latitude, as defendants are continuing to be identified and the list of said defendants will be expanded as they are "outed" and identified.

Plaintiff requests the court order an independent investigation into the crimes being committed against the Plaintiff, by appropriate agencies.

# 12. Dr. Scott Benson Report

**Birapaka, Vara P**
Office/Outpatient Visit
**Visit Date:** Thu, May 14, 2015 01:06 pm
**Provider:** Scott Benson, MD (Assistant: Ann Rognerud, RN)
**Location:** Apple Valley Medical Clinic, LTD

Electronically signed by Scott Benson, MD on 05/14/2015 08:37:58 PM
Printed on 05/15/2015 at 9:25 am.

## SUBJECTIVE:

### CC:
Mr. Birapaka is a _____ Asian male. This is an established patient visit Reason for follow up visit: stress caused by neighbors, he is having spinal pain in his upper back and neck.

### HPI:
For several months, he's been the object of interest to his neighbors, who have been throwing things at his dwelling, on his deck, at his vehicles. They have been following him when driving. He has been collecting data on this activity. This activity has been causing him a great deal of stress, some anxiety, and has been resulting in his inability to sleep well with resulting muscle spasms in his neck and upper back. He has pain in the neck and upper back, worse as the stress has increased. He notes pain radiating distally, some into the arms and some into the legs, moderate in severity. Some improvement with relaxation, but seems to be present constantly. Feels aches and spasm at the area.

### ROS:
**CONSTITUTIONAL:** Negative for chills and fever.
**EYES:** Negative for blurred vision.
**E/N/T:** Negative for hearing problems, E/N/T pain, congestion, rhinorrhea, epistaxis, hoarseness, and dental problems.
**CARDIOVASCULAR:** Negative for chest pain and palpitations.
**RESPIRATORY:** Negative for recent cough and dyspnea.
**GASTROINTESTINAL:** Negative for abdominal pain, heartburn, constipation, diarrhea, and stool changes.
**MUSCULOSKELETAL:** Positive for back pain.
**INTEGUMENTARY:** Negative for rash.
**NEUROLOGICAL:** Positive for headaches. Negative for ataxia, dizziness, fainting, memory loss, paresthesias, seizures, tremor, vertigo or weakness.
**HEMATOLOGIC/LYMPHATIC:** Negative for easy bruising and excessive bleeding.
**ENDOCRINE:** Negative for temperature intolerances.

### PMH/FMH/SH:
Last Reviewed on 5/14/2015 08:33 PM by Benson, Scott J
**Past Medical History:**
UNREMARKABLE

**Surgical History:**

Positive for,
Sinusectomy;

**Family History:**
Unremarkable

**Social History:**

Marital Status: Single
Children: None

**Tobacco/Alcohol/Supplements:**
Last Reviewed on 5/14/2015 08:33 PM by Benson, Scott J
Tobacco: He has never smoked.

Alcohol:
Drinks alcohol very infrequently. Tobacco: He is exposed to tobacco smoke: no

**Substance Abuse History:**

CPT® is a registered trademark of the American Medical Association

44

Office/Outpatient Visit
Visit Date: Thu, May 14, 2015 01:06 pm
Provider: Scott Benson, MD (Assistant: Ann Rognerud, RN)
Location: Apple Valley Medical Clinic, LTD

Electronically signed by Scott Benson, MD on 05/14/2015 08:37:58 PM
Printed on 05/15/2015 at 9:25 am.
Last Reviewed on 5/14/2015 08:33 PM by Benson, Scott J

**Mental Health History:**
Last Reviewed on 5/14/2015 08:33 PM by Benson, Scott J

**Communicable Diseases (eg STDs):**
Last Reviewed on 5/14/2015 08:33 PM by Benson, Scott J

**Current Problems:**
Last Reviewed on 5/14/2015 08:33 PM by Benson, Scott J
*Dizziness*
GERD
Low back pain
Vitamin D deficiency
Stress
Anxiety, generalized
Upper back pain

**Allergies:**
Last Reviewed on 5/14/2015 08:33 PM by Benson, Scott J
Terramycin IM:

**Current Medications:**
Last Reviewed on 5/14/2015 08:33 PM by Benson, Scott J
Multivitamins
Vitamin B complex

## OBJECTIVE:

**Vitals:**

Current: 5/14/2015 1:13:21 PM
Ht: 5 ft, 5 in; Wt: 151 lbs; BMI: 25.1
BP: 129/79 mm Hg (right arm, sitting); P: 88 bpm (right radial, sitting, regular); sCr: 1 mg/dL; GFR: 78.33

**Exams:**
PHYSICAL EXAM:
GENERAL: well developed, well nourished; well groomed;
EYES: conjunctiva and cornea are normal;
E/N/T: normal EACs, TMs, nasal/oral mucosa, teeth, gingiva, and oropharynx;
NECK: range of motion is normal; thyroid is non-palpable; carotid exam is normal with good upstroke and no bruits; mild spasm paracervical muscles;
RESPIRATORY: normal appearance and symmetric expansion of chest wall; normal respiratory rate and pattern with no distress; normal breath sounds with no rales, rhonchi, wheezes or rubs;
CARDIOVASCULAR: normal PMI placement; no thrills, heaves, or lifts; normal rate; rhythm is regular;
GASTROINTESTINAL: nontender, nondistended; no hepatosplenomegaly or masses; no bruits;
LYMPHATIC: no enlargement of cervical or facial nodes; no supraclavicular nodes;
SKIN: No rashes present
MUSCULOSKELETAL: spasm bilateral para upper thoracic muscles with from;
NEUROLOGICAL: cranial nerves, motor and sensory function, reflexes, gait and coordination are all intact;
PSYCHIATRIC: appropriate affect and demeanor; normal speech pattern; grossly normal memory;

**Birapaka, Vara P.**
Office/Outpatient Visit
**Visit Date:** Thu, May 14, 2015 01:06 pm
**Provider:** Scott Benson, MD (Assistant: Ann Rognerud, RN)
**Location:** Apple Valley Medical Clinic, LTD

Electronically signed by Scott Benson, MD on 05/14/2015 08:37:58 PM
Printed on 05/16/2015 at 9:25 am.

## ASSESSMENT:

300.02 Anxiety, generalized
    DDx:
300.02 Stress
    DDx:
724.1 Upper back pain
    DDx:
V72.82 Laboratory examination ordered as part of a routine general medical examination
    DDx:

## PLAN:

Anxiety, generalized behavior options for stress/anxiety reduction discussed

Upper back pain

RADIOLOGY: I have ordered XR cervical spine limited 2 views and XR thoracolumbar spine 2 views to be done today.

Orders:
72040 Radiologic examination, cervical spine; 2 views (In-House)
72080 Radiologic examination, thoracolumbar spine; 2 views (Send-Out)

Laboratory examination ordered as part of a routine general medical examination
LABORATORY: labs ordered to be performed today include Venipuncture and CBC comprehensive metabolic panel lipid panel TSH urinalysis.

Orders:
36415 Collection of venous blood by venipuncture (In-House)
85025 AN1 Automated complete blood count with differential (In-House)
80053 AN1 Comprehensive Metabolic Panel (In-House)
80061 AN1 Lipid Panel (In-House)
84443 AN1 TSH (In-House)
81003 AN1 Urinalysis, automated (not ua-dip) (In-House)

## 13. DR. SUSAN KOLB'S AFFIDAVIT

# PLASTIKOS

**Plastic and Reconstructive Surgery**
Susan E. Kolb, M.D., F.A.C.S.
Julian B. Gordon, M.D.

STATE OF GEORGIA

COUNTY OF( *Fulton* )

I, Susan Kolb, being duly sworn upon oath, hereby affirm and state the following as true and accurate facts:

1. I am a medical doctor, currently actively licensed to practice medicine in the state of Georgia, United States of America;
2. My medical practice is located at 4370 Georgetown Square, Atlanta GA 30338;
3. The telephone number for my medical practice is (770) 457-4677;
4. My medical practice is conducted as Plastikos Plastic and Reconstructive Surgery;
5. That I have a patient by the name of Vara Birapaka;
6. Mr. Birapaka underwent surgery, which I conducted, on March 31, 2017;
7. The intent and result of that surgery was to remove foreign devices from Mr. Birapaka's body;
8. I affirmatively state that I removed ___4___ (insert number) foreign devices from Mr. Birapaka's body and have retained said devices for inspection at my facility;
9. It is my professional opinion that said devices were implanted into Mr. Birapaka's body, as I have no knowledge of any way such devices could be introduced in any other manner;
10. I am prepared to offer documentation of the surgery, the removal of the devices and all of my notes and comments during the surgery, upon request.

FURTHER AFFIANT SAYETH NAUGHT.

_____
SUSAN KOLB

SUBSCRIBED AND SWORN TO
BEFORE ME THIS *3rd* DAY OF
*April* , 2017.

_____
Notary Public or other Official

## 14. The Implant Specimen Image

# APPLIED CONSUMER SERVICES, INC.

11890 N.W. 87 COURT, UNIT #8, HIALEAH GARDENS, FL 33018
*Phone: (305) 821-1677  Fax: (305) 821-0155  Website: appliedconsumer.com*

**L/N: 29909**
**4/11/17**

### Sample "IHS-04072017"

### OBJECT 1

Side A, Magnification 13.4 X



# 15. DR.STANINGER'S REPORT ON THE IMPLANT



## Integrative Health Systems®, LLC

*"ONE CELL ONE LIGHT."*

Mr. Vara Birapaka
3575 Lexington Ave. S. Apt # 315
Eagan, Minnesota 55123

© June 8, 2017

Phone: 507-358-8721

### PHASE III: RAMAN/MICRO FTIR MICROSCOPY
### RE: Specimen Analysis Report

### LN: 29909

**INTRODUCTION**

A collection of one (1) specimen(s) was received by Integrative Health Systems®, LLC for Phase I: Photomicrographic Imaging and Phase II: EDS/SEM Spectroscopy analysis evaluation with technology assessment analysis for nanotechnology as a biosensor and/or nano vehicle sensor design. The results of these tests were reported in a report by Dr. Hildegarde Staninger®, RIET-1 dated May 19, 2017.

The specimen was removed from Vara Birapaka Prasad's from his right ear (area) as a foreign body on March 31, 2017 per operating notes. The specimen was received by Integrative Health Systems®, LLC on April 7th, 2017 and forwarded to their contract laboratory, Applied Consumer Services, Inc., Hialeah Gardens, FL for photomicrographs of the specimen (front and back) on that same day as reported in report dated May 19, 2017.

The specimen had analysis utilizing EDS/SEM and RAMAN/Micro FTIR technologies, Phase II as stated in the above referenced report. Raman/Micro FTIR analysis results were performed and received on April 25, 2017. After the additional analysis was performed the specimen(s) will stay in storage as directed by client or will be returned to IHS and then to client. After all analysis is performed a copy of the "Chain-of-Custody" form(s) will be attached to this report located at the end of this report with the final signature Chain-of-Custody upon final completion of all analysis to be performed. The final COC will be sent after all work is completed and/or specimen is released from storage in the lab.

The foreign body specimen(s), which upon Phase I: Photomicrographic Imaging is a 3D sensor/chip that has been associated with parts of a wireless sensor body network

415 ½ N. Larchmont Blvd., Los Angeles, California 90004 - Tel: 323-466-2599 Fax: 323-466-2774
www.onecellonelightradio.wordpress.com

(Example: US Patent: 2013/0194092 A1 – Unlocking a Body Area Network Assignee Qualcomm Incorporated, San Diego, CA) as well as being part of the described collaborative research and developmental global projects that are addressed in the text book: Three-Dimensional Integration of Semiconductors: Processing, Materials and Applications by Kazuo Kondo, Morihiro Kada and Kenji Takahashi, Editors. Springer, Heidelberg, Germany © 2015. This would include the use of "invisible circuits" and their designed network systems. The individual pieces are considered nano advanced materials piece parts in the design of an integrated fusion system as applied to remote sensing technologies.

This report will specifically address the Phase III: Raman/Micro FTIR Microscopy Analysis results. The reader should refer back to the Photomicrographs of the specimen and their previously mentioned report dated May 19, 2017, so one may reference the advanced materials while reading this particular report. The Raman results will further assist in the technology assessment of design, architecture and fabrication of the specimen, which will be discussed in the Conclusion section of this report.

## RESULTS & DISCUSSION
### PHASE III: RAMAN/Micro FTIR Microscopy
The Raman/Micro FTIR chromatographs were carefully utilized in the review of the analytical data results, because of the observation of specific peak values and the bond angles associated with the materials to better identify nano analysts used in the composition and architectural design of the specimen(s).

The Phase III results will be identified per matching Object number and what was utilized in the specimen with each peak number identified with its interpretation. When utilizing Raman/Micro FTIR Microscopy the presence of a peak is detected at a molecular value and not a specific quantitative value (Example: mg, ug, ppm, ppb, etc).

The laboratory, Applied Consumer Services, Inc. will return the specimens to Integrative Health Systems, LLC, if the client does not want to pay a required minimum six (6) month storage fee as requested by the laboratory.

### LN: 29909 Raman Frequency Peak Results from Chromatograph

~ 3304 $cm^{-1}$ – Biomedical applications of polymer blends. H-bonded hydrogyl/salts. If 3304 a carbonal with 1725 $cm^{-1}$ then a coherent energy transfer in an- helical peptide by Fermi resonance (DL Clark 1992) at the NH stretch.

Key to this is triethylprop-2-ynylammonium p-bromobenzyenesulphonate salt in dilute chloroform (3180 $cm^{-1}$). Analite and lysis at 3304 $cm^{-1}$. Diastereoisonmers P. Chavette of a triple peptide Na-Z-N-Bz-Lys-ALA-SAR-OBz1 with 3110 and 3304 $cm^{-1}$ Bi nuclear transitional metals with isoniayid. Integrated with 1669 $cm^{-1}$ and 1558 $cm^{-1}$.

**Note:** Isoniayid - Isoniazid, also known as isonicotinylhydrazide (INH), is an antibiotic used for the treatment of tuberculosis. For active tuberculosis it is often used together with other antibiotics. **Metabolism:** liver; CYP450: 2C19, 3A4 inhibitor. **Biological half-life:** 0.5-

1.6h (fast acetylators)  **Trade names:** Hydra, Hyzyd, Isovit, other  **Excretion:** urine (primarily), feces.

The compound triethylprop-2-ynylammonium p-bromobenzyenesulphonate is used for/as an ATP sensor "polythiophene device" as developed by Guangyou Zheng, Canadian Patent: CN105198910 A.  It will have added to it a fluorescent sensor that will delete CNL as BODIPY with PDT$_1$ and bioning appleate as an AZ dye.  Columi sensing receptor active compounds as used in US Patent 20120101039, Denmark Jet Fenscholdt, Leo Pharma A/S.

~ 3068 cm$^{-1}$ – liquid m-dichlorobenzyene splits into two components at 3062 cm$^{-1}$. Evib > 3068 cm$^{-1}$, the resonant emission for energy dissipation in molecular systems.

~ 3007 cm$^{-1}$ – (3082 to 3007 cm$^{-1}$) 2-pyridinethiol Canadian Patent:  CN105198910 A.

~ 2925 cm$^{-1}$ -  strong aliphatic C-H states, centered around 2925 cm$^{-1}$.  2-pentanone thiophene-based thin polymer films. (A Tamanai/2013)  Heptane 2960 cm$^{-1}$ and 2925 cm$^{-1}$ with 2855 cm$^{-1}$ being anti-symmetric CH$_2$ out of plane with 850 cm$^{-1}$ and 800 cm$^{-1}$.(2854 to 2925 cm$^{-1}$) n(CH), sp$^3$.

~ 2854 cm$^{-1}$ - + 2925 cm$^{-1}$ Sickle pod plant (Senna obtusifolia) (RE Harry – Okura/2005) and 2925, 2854, 1738, 1679 and at 3412 cm$^{-1}$.  Seed processing DoTAP alone 2953.7 cm$^{-1}$ and 2854 cm$^{-1}$.    DoTAP· is for DNA Complexation with cationic lipids. (This may be an identification tag for the senor/waveguide device, which would be registered with FDA for Body Network Sensor Systems.)

*Senna obtusifolia* (Chinese senna, American sicklepod or sicklepod)  is  a legume in the genus *Senna*, sometimes separated  in  the monotypic genus *Diallobus*. It  grows  wild in North, Central, and South America, Asia, Africa, and Oceania, and is considered a particularly serious weed in many places. It has a long-standing history of confusion with *Senna tora* and that taxon in many sources actually refers to the present species. It is a dicot vs. a monocot.

The green leaves of the plant are fermented to produce a high-protein food product called "kawal" which· is eaten by many people in Sudan as a meat substitute. Its leaves, seeds, and root are also used in folk medicine, primarily in Asia. It is believed to possess a laxative effect, as well as to be beneficial for the eyes. As a folk remedy, the seeds are often roasted, then boiled in water to produce a tea. The plant's seeds are a commercial source of cassia gum, a food additive usually used as a thickener and named for the Chinese Senna's former placement in the genus *Cassia*. Roasted and ground, the seeds have also been used as a substitute for coffee. In traditional Korean medicine, they are called *gyeolmyeongja* (결명자) and usually prepared as tea. They are also used in Kampō (traditional Chinese medicine in Japan), where they are called *ketsumei-shi* (ケツメイシ, 決明子) or by their Chinese name *jué míng zǐ* (traditional: 決明子, simplified: 决明子).

~ 1745 cm$^{-1}$ -  carbonyl stretching of a ring Ketone.   Ochratoxin A at 1745 cm$^{-1}$ and Ochratoxin B at 1730 cm-1.

3

~ **1648 cm$^{-1}$** - 1681 cm$^{-1}$ and 1648 cm$^{-1}$ + RNA 1648, 1540, 1515 and 1407 cm$^{-1}$ Kevlar and spider nephila edulis Bombyx mori (silkworm). (Researcher: JG Gwilyn). (400 Deltor) * 1648 cm$^{-1}$ and 1536 cm$^{-1}$ spider and silkworm ducts. Beta chitin amide I and II bands 1648 cm$^{-1}$ and 1536 cm$^{-1}$ crystal forms of Beta Chitin, at the OH bond.

` **1536 cm$^{-1}$** – protein amid II at 1536 cm$^{-1}$ guanine base shift towards 1690 cm$^{-1}$. Fe(III) fix Rc$_p$M -1 at ~ 1536 cm$^{-1}$. [Rhodospirillum rubrum A] At 1543, 1536 and 1536 cm$^{-1}$ for ferrous heme Cl, heme 6 H (C. Le Moigne, Risperidone molecu (1536 cm$^{-1}$) acetone 1538 cm$^{-1}$.

~ **1455 cm$^{-1}$** – Lewis –type acid sites (1446 cm$^{-1}$ and 1455 cm$^{-1}$). ~ 1446 cm$^{-1}$ disappears upon desorption.

**Note:** **Desorption** is a phenomenon whereby a substance is released from or through a surface. The process is the opposite of sorption (that is, either adsorption or absorption).

~ **1399 cm$^{-1}$** – when Ion is detached by E "mode" at 1399. B-N Stretching at 327 and 447 cm$^{-1}$. * Improved binding of 2,4 dinitrotoluene in a y-CD/metaoxide ma CSPI sensor System handmade potentio stat and a frequency response analyzer at 1456 cm$^{-1}$ and 1399 cm$^{-1}$ in same plane –CH$_2$ and O-H. The matrix and CSPT finger print (Luca Prodi) Lumineise Applied in Sensor Science. Chemical sensor DiVA – stacked mobile phone as a chemical sensor DiVA.

~ **1237 cm$^{-1}$** - Silica gel. PV (poly vinyl) 1233 cm$^{-1}$ VS (vinyl silicone) 1260 cm$^{-1}$. ~ 1237 cm-1 = organophosphorus compounds with TiO$_2$ and WO$_3$ surface. MARS with wave guide 8.0 um 1229 to 1237 cm$^{-1}$. (Note peaks observed.)

~ **1163 cm$^{-1}$** – D$_2$O spectra photoexcitation at 1168 to 1169 cm$^{-1}$ for PYPH and PYPL Photoactive Yellow Protein (chromophore). In-situ organic semiconductor thin films for gas. Electro-spur polymer composites.

~ **1095 cm$^{-1}$** – nanocellulose 1414, 1095, 895 cm-1. At 1095 cm$^{-1}$ tunicate cellulose whiskers. A **tunicate** is a marine invertebrate animal, a member of the subphylum Tunicata, which is part of the Chordata, a phylum which includes all animals with dorsal nerve cords and notochords. The subphylum was at one time called Urochordata, and the term urochordates is still sometimes used for these animals.

The Tunicate cellulose whiskers are embedded in epoxy resin and deformance at the 4-point bending in tension, acid hydrolyzed cellulose whiskers. (Nanocellulose Technology and American Processing, Inc. Kim Nelson, VP. AF Turnbak, Snyder and Sandle US Patent 4,341,807 and 4,374,702 and 4,378,381.)

**Note:** Red particle – animal protein glycerol ester of unsaturated fatty acids.

General Observance of Raman Peak Frequency values illustrated the following:

4

- Spider silk peptide is a component of linked nano spring, which is ideal for intracellular tension sensing. (Researchers: MD Brenner and B Zhau)
- Cellulose Whiskers – US Patent 201402136 and US 20140213764
- Yellow Protein – March 31, 2014 – atecholanine $CCF_2$ BoDIPY TMR and Alexa Fluor used in Geneblazer® PVC stretching and bacteria. US Patent 92502352 National Centre for Biological Sciences.
- Yamuna Krishnan – Intracellular pH sensor. Canada Patten: CN 159870A? I with Oracle and IBM. Contains a nano switch that is triggered by specific proteins.
- Silkworm fibers fibroin opals. WO 2013130156 A2? Cl. Lipoproteins "Blue" fluorescence per BFP enhanced Yellow EYFP camera or sensor that detects for and records. University of MD, IAIDANS. Elizabeth Homes, Theranos, Inc. US 9592508 multi-anlaysis 2011. US Patent: US 8435738 and US 6278600.

## CONCLUSIONS

The correlation of the data from the photomicrographs and the EDS/SEM result values and the specific peak values determined from the Raman/Micro FTIR data clearly show that the specimens taken out of the body of Vara Birapaka is an implantable biosensor technology.

The specific identification of peaks that were for the presented as the following chemical finger printable ID(s):

- Used with Fermi resonance of triethylprop-2-ynyl ammonium p-bromobenzenesulphonate salt in dilute chloroform.
- A bi-nuclear component of metals with isoniazid reactions for an ATP sensor as a polythiophene device with a fluorescent sensor BoDIPY with $PDT_1$ for columi sensing receptor active compounds. EVib resonant enussl from energy dissipation in molecular system. Present molecule 2-pyridinethiol.
- Presence of sickle pod (Senna obtusifolia) as a tag or glue for sensors.
- Ochratoxin A and Ochratoxin B (advanced materials are being made from fungi and their mycotoxins).
- Spider and silkworm ducts with Kevlar at Beta chitin amide I and II bands. Amid II present.
- Rhodospirilium rubruam A and Risperidone molecule present with possible acetone and ferrous heme chloride.
- A specific Lewis-type acid site that causes the molecule to disappear upon desorption. This is at 1455 $cm^{-1}$ to 1446 $cm^{-1}$, which was observed in the Raman Peak values as well as 1399 $cm^{-1}$ which is obse4ved in Energy mode Ion bridges using 2,4 dinitrotoluene in y-CD/metaoxide ma. This is specifically used in CSPI Sensor Systems and are handmade. This matrix may have a chemical sensor component known as DIVA.
- A silica gel composed of polyvinyl and/or vinyl silicone with organophosphorous compounds with its surface being composed of titanium oxides and tungsten oxate. If any H-SCADA measurement was at 8.0 um for a waveguide (see Body Map or Report by Melinda Kidder, PI, CESCO) then utilized in MARS Space Medicine studies, et. al.

5

- Photoexcitable Yellow Protein (PYPH and PYPL used inpsitu organic semiconductors for thin film technology for gas detection.
- Nano cellulose Tunicate cellulose whiskers embedded in epoxy resin and to deform at 4 –point bending in tension through acid hydrolyzed areas of the cellulose whiskers.

The reports referenced US and Canadian patents address specific research funding, licensing and manufacturers. The sensor that was removed has specific chemical identification factors that are specific to its body network system usage, owner and manufacturer.

It is clearly shown that the specimens are from current nano remote sensory technology used in the monitoring of chronic diseases such as cancer and other chronic diseases as well as the hybridization of the human.

Review of previous FCC Universal Licensing searches will be necessary to compare any university and/or company that utilized the above specific parameters in their teleometric/remote monitoring platforms.

The use of non-viral vectors may have been specific for the delivery of DNA/RNA coded communication systems within as gene plasmids coupled with nano technology to develop a nano delivery system that can store at minimum 5,000 doses on nano particles, if used as a nano medicine delivery system device. A specific type of sensor that is handmade for energy transfers is a CSPI Sensor System. This same system may be used for chemical sensing as a DiVA. The specific Raman Peak frequencies of 1455 (1456) and 1399 $cm^{-1}$ were observed in the results of the specimen analyzed.

The materials identified as foreign bodies are clearly man-made nano sensor devices that are used in implantable delivery systems such as PrEPs and other formats.

The Raman/Micro FTIR peaks that showed bacteriorhodopsin as well as rhodopsin is very key to the specimens ID. (See attached paper: A three-dimensional movie of structural changes in bacteriorhodopsin by Eriko Nago, et. al Science 23 December 2016).

Bacteriorhodopsin (bR) is a light-driven proton pump and a model membrane transport protein. Dr. Nago and his team used time-resolved serial femtosecond crystallography at an x-ray free electron laser to visualize conformational changes in bR from nanoseconds to milliseconds following photpactivation. Initially twisted retinal chromospheres displace a conserved tryptophane residue of transmembrane helix F on the cytoplasmic side of the protein while dislodging a key water molecule on the extracellular side. The results of their research showed that the a cascade of structural changes throughout the protein shows how motions are choreographed as bR transports protons uphill against a transmembrane concentration gradient. And through this ability of bacteriorhodopsin and light activation it is an ideal nano chemical component of a nano drug delivery system for remote delivery systems.

6

It is important to note that any and all of the crystals identified through the Raman analysis are microcrystals suspended in a lipidic cubic phase matrix, which as Nango, et.al stated may contradict Jardetzky's framework in how water mediates a protein (water being a liquid crystal).

It is suggested that the US Patents identified in this report be reviewed for the following:

- If they were grants.
- Universities involved in the research for the patent
- Multiple uses in an nanotechnology and remote monitoring system (telemedicine and electropharmaceuticals).
- The abuse of the intellectual property.
- and any other correlation.

Further correlation of the universities sited in this report to the university incubator and the assignment of technology related to the key components found in this report are necessary for the review and licensing of the technology. The FCC Universal Frequency search specifically states specific educational institutions that are the licensee of the technology under the licenses stated on these searches. The key tag of Tunicate nano cellulose whiskers and Sickle pod plant with yellow protein dyeare as a specific Raman signal and the Bacteriorhodopsin presence, which is for a specific designed 3D semiconductor sensor.

The compounds identified in the analysis clearly point to the materials being in the category of 3D Semiconductor Integrated Circuits which are composed of sensors, biosensors, nano particles, Q Factors, Q cubes and many other piece parts associated with making a smaller implantable technology through a body sensor network systems.

It is important to note that three types of glass (nano glass) was found in the analysis. These glasses are used with remote sensing integrated systems such as microwave, lasers, RF signals, electromagnetic systems, and many others. The glass will have organometallic complexes in it so it may also be monitored remotely through IR (Infrared) technology/cameras as well as receive a laser coupled signal or pulse wave from a nano cube satellite linked to a laser, such as Cobra Eye at MIT.

A review of any previous reports of FCC Universal License and Equipment searches will show the primary entities involved in the signal delivery system of the implantable sensor(s) that was removed from Vara Birapraka. And it should be remembered that the signals will be received as long as the device (sensor/implant) is still active to receive the signal.

Further, investigation will be done on a continuous bases as needed to assist client further into the design of the specimen and its unique composition parameters, which will and have assisted in identifying the collaborative Innovative Intellectual Property, its owner, licensee, research funder, university contributor and ultimate manufacturer of the sensor as it's described in this report.

7

In summary, it is strongly suggested a complete review of previous reports be done to add to the this current and comprehensive report on the data analysis of photomicrographs, EDS/SEM and RAMAN/Micro FTIR data as obtained from the laboratory. This will allow for a comprehensive correlation of the advanced materials design, composition and functional use.

Also, it is important to point out that the use of "Mutant Silkworms" and inserting a movable sequence of DNA called the piggyback transposon (snips of spider genes into silkworm embryos) resulted in silk different propertied that were dependent on where in the silkworm chromosome the spider DNA ends up. The original work was done by Malcom Fraser of the University of Notre Dame. In September 2010 Fraser and his collaborators, including biochemist Randy Lewis of the University of Wyoming and Kim Thompson of Kraig Labs, presented these findings at a press conference on the Notre Dame campus. They added a gene to the spider DNA for red fluorescent protein in the spider DNA, ensuring all the mutants had glowing red eyes. The researchers then bred those catepillers to raise a stable colony of spider-silk spinning silkworms, which is 80% stronger than Kevlar. It is important to note that both blue fluorescent dye was found in the Raman Peak Values as well as a fluorescent yellow protein, which may be an indicator of the commercial manufacturer of their designed innovative IP, since a biomedical engineer David Kaplan of Tufts University noted they added another fluorescent protein to the spider genes to make the silk itself glow green (yellow + blue = green color), with a goal of a potential application of making bandages that stimulate the growth of regular skin instead of scar tissue.

If you should need any further assistance with this report or other matters, please do not hesitate to contact Integrative Health Systems®, LLC at phone: 323-466-2599. A copy of the text referenced patents and articles will be sent to client via-email.

Signature: _____  Date: June 8, 2017

Dr. Hildegarde Staninger, RIET-1
Industrial Toxicologist/IH & Doctor of Integrative Medicine
IEIA H-SCADA BioEnergy Field Professional Cert. N0.: 20150911005
NREP Certified Environmental and Safety Compliance Officer
    Cert. No.: 774709608161213
IEIA Registered & Certified Industrial Environmental Toxicologist
    Cert. No.: RIET-1/CIET-1

## REFERENCES

1. Hur, E. and DJ Moon. *Steam reforming of glycerol into hydrogen over nano-size Ni-based hydrotalcite-like catalysts.* J. Nanosci. Nanotechnology 2011 Aug: 11(8): 7394-8 (http:///www.ncbi.nlm.nih.gov/pudmed/22103204)

2. Rivera, JA, Fetter, G and P. Bosch. *New hydroxyapatite-hydrotalcite composites II*

8

## 16. PRAYER FOR RELIEF

Wherefore, Plaintiff, Vara Birapaka prays for judgment against Defendants, and each of them, jointly and severally, as follows:

1. Immediate injunctive relief against all named Defendants and unnamed conspirators 1 through 100,000 to discontinue their unlawful triggering of aforementioned war technologies, Nano technologies and devices; to stop the torture and assaults, community spreading of propaganda and slander of the Plaintiff and to stop all non-consensual human experimentation against the Plaintiff as in all other harms being committed, subject to a hearing on the merits of the case to be set at the discretion of the court;

2. That the case be sealed so as to protect Plaintiff against escalated and life endangering harassment;

3. Civil penalties available under federal and state law by proof, including treble damages, under 18 U.S.C. § 1964(a);

4. Reimbursement of the costs of suit as available under 18 U.S.C. § 1964(a) and as otherwise available under state and federal law;

5. Reasonable attorney fees as available under 18 U.S.C. § 1964(a) and as otherwise available under state and federal law;

6. Damages as follows:

A) Compensatory damages in an amount to be proven at trial;
B) Medical and related expenses in an amount to be proven at trial;
C) Damages to professional reputation, character and personality in an amount to be proven at trial;
D) Damages for loss of personal possessions, in an amount to be proven at trial;
E) Special damages including but not limited to restitution for theft of intellectual property, in an amount to be proven at trial;
G) Any restitution above and beyond the above stated damages, in an amount to be proven at trial;

7. That the court order an investigation into the crimes being committed against the Plaintiff by appropriate agencies;

8. Such other and further relief as the Court deems proper.

## 17. DESIGNATION OF TRIAL AND REQUEST FOR A BENCH TRIAL

Plaintiff designates St. Paul, Minnesota as the location for and requests a bench trial in this matter.

Respectfully submitted,

Vara Birapaka
3575 Lexington Ave S
APT #315
Eagan MN 55123

By:_____ September 22 2017

Vara Birapaka, Individually *pro SE*

## EXHIBIT A

## DEFINITIONS

BCI– Brain Computer Interface

RNM–Remote Neural Monitoring

RFID–Radio Frequency Identification

BioAPI–Biological Application Programming Interface